**Deborah L. AVERY, Plaintiff-Appellant,**

v.

**Robert JENNINGS, John E. Held, Joseph DeCourcy, Jr., Defendants-Appellees.**

No. 85–3075.

United States Court of Appeals, Sixth Circuit.

Argued Nov. 14, 1985.

Decided March 20, 1986.

Robert B. Newman (argued), Cincinnati, Ohio, for plaintiff-appellant.

James W. Harper (argued), Asst. Pros. Atty., Cincinnati, Ohio, for defendants-appellees.

Before MERRITT and MARTIN, Circuit Judges, and JOHNSTONE, Chief Judge.*

MERRITT, Circuit Judge.

■ The question presented here is one of first impression: To what extent does the first amendment principle prohibiting political *discharge* of government employees, established in *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), and *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), apply to political *hiring* decisions by local elected officials? We hold that although the first amendment prohibits official hiring policies based solely on political affiliation, it does not constitutionalize civil service standards or establish a hard and fast employment rule against weighing political factors. Neither Congress, a state legislature, nor a local administrator may "enact a regulation" against hiring members of a particular political party, *United Public Workers v. Mitchell*, 330 U.S. 75, 100, 67 S.Ct. 556, 569, 91 L.Ed. 754 (1947), or exacting a loyalty oath, *Wieman v. Updegraff*, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952), but elected officials may weigh political factors such as party allegiance along with other factors in making subjective hiring judgments.

## I.

Deborah Avery appeals the District Court's grant of summary judgment for the defendants, 604 F.Supp. 1356. There is no genuine issue as to the facts.

The three defendants are members of the Republican Party in Hamilton County, Ohio, and hold the locally elected positions of Clerk of the Court of Common Pleas (Jennings), County Recorder (Held), and County Auditor (DeCourcy). Plaintiff Avery, a member of the Democratic party, applied to each for a clerical job as a secretary, clerk, or office helper. None of the officials knew of her political affiliation.

The political affiliation of a job applicant is taken into account in the hiring process in a round-about sort of way. As jobs become available, the official for the most part fills the vacancies informally on an *ad hoc* basis with friends, relatives, or acquaintances, or with the friends or relatives of political allies. Since plaintiff was unconnected with this network, her application was not considered.[1]

Each of the elected officials testified that he had no firm rule or policy forbidding the

---

* The Honorable Edward H. Johnstone, Chief Judge of the United States District Court for the Western District of Kentucky, sitting by designation.

1. Plaintiff's brief fairly sets out the way the system works:

   The way the hiring system works is best demonstrated by the examples of those re-

cently hired. From January 1, 1983, to October 6, 1983, Robert Jennings hired 20 people. Steven Crawford was hired on the recommendation of Adeline Womack the court reporter to the Republican Judge, Norbert Nadel. Susan Horn was hired at the suggestion of her father who is Jennings' Supervisor in the Automobile Title Department. Ms. Horn is a

235

hiring of Democrats, and that he usually did not inquire into party affiliation. They also testified, however, that the informal hiring system operates to prefer Republicans and that since they are Republican office holders this preference is natural and reasonable in their view. For example, Jennings testified that he "would favor hiring qualified Republicans" for his office. DeCourcy stated that "all things being equal I prefer to have a Republican working for me because I assume that he would be more interested in taking part in helping me get re-elected." And Held stated that "it just works better when people have the same philosophy."

The statistical evidence in the record bears out the elected officials' testimony and the plaintiff's argument that the system operates so as to give preference to Republicans. Discovery taken during pretrial proceedings revealed that defendants' offices were staffed overwhelmingly with Republicans, with a sprinkling of Democrats. For example, Jennings' office had hired 210 persons from January 1, 1976 through October, 1983, only two of whom were registered Democrats. Similar patterns were shown for the offices of Held and DeCourcy: The Recorder's Office had

hired 62 persons during the same period, five of whom were Democrats. The Auditor's office had hired 160 persons during the same period; three of them were Democrats.

The District Court granted summary judgment in favor of the defendants on several alternative grounds. First, the District Court held that the Supreme Court's invalidation of politically-motivated discharges in *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), and *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), does not apply to hiring practices but only to discharge. Second, that plaintiff had failed to satisfy the requirements for making out a first amendment violation under other principles of first amendment law relating to public employees. Third, that in order for plaintiff to show a first amendment violation she must show that the defendants deliberately refused to hire her because of her political beliefs and party affiliation, which she had failed to do since the evidence showed that none of the defendants had any knowledge of her beliefs or affiliation.

## II.

In reviewing a grant of summary judgment the appellate court must view the

Republican. Steven Kirschner, son of Leonard Kirschner, the Chief Assistant of the Appellate Division of the County Prosecutor's Office, was another hired. Jill Leis, daughter of Judge Simon Leis, was hired. Judge Leis is a Republican. Patrick Maloney, son of the former State Senator and present County Administrator, a Republican, was hired. One James Nichols, a manager of a night club where the Republican 9th Ward Club held meetings was the next employee. Mr. Jennings had known Mr. Nichols for a "long, long time." Laurie Peck, who is related in some way to Judge John Peck was recommended by John Bailey who was "... always active in Ray Shannon's campaign[s] ..." Judge Shannon is a Republican Judge in the Court of Appeals. Kelley Raabe was hired on the recommendation of her mother who works for Jennings in the Automobile Title Department. Karen Rosen, the daughter of the Republican Judge Jack Rosen, was hired in this period. A political supporter of Jennings, Ellsworth Solomon, who has "... always helped me [Jennings], he has always put signs in his yard and things like that ..." was

hired. Bill Schoenfeld, a brother of the attorney and a cousin of another Jennings employee was hired. Mary Trimpe, a former employee, was reemployed. Barbara Morand, wife of attorney Leo Morand, who was a Republican precinct executive in the 25th Ward when Jennings was Ward Chairman was hired in the Auto Title Department as a clerk typist. William Becker, an "Old Republican" whom Jennings has known since they were kids was hired as a criminal bailiff. Cleary Buchert was referred to Jennings by the Chief Bailiff in the Criminal Division, however, Jennings has known Buchert's family for "a lot of years." Buchert's grandfather and Jennings' father were both precinct executives together in the 25th Ward. Buchert was hired as bailiff. Scott then was referred by his father-in-law who works in the County Commissioners [sic] office. Whenever Jennings ran for an elective office the father-in-law "was always in my [Jennings'] corner." This is the fashion in which people have been typically hired during the tenure of Mr. Jennings.
Appellant's Brief at 5–7 (citations omitted).

record in the light most favorable to the party adversely affected. *Bishop v. Wood,* 426 U.S. 341, 347–48, 96 S.Ct. 2074, 2078–79, 48 L.Ed.2d 684 (1976). Appellee's brief appears at any rate to accept Avery's version of the facts presented on summary judgment. In this case, that means accepting that defendants had a general practice of hiring those applicants who were friends or who were referred by political allies leading to a disproportionate number of Republican employees. The question presented is thus whether, in light of *Elrod* and *Branti,* such a practice unconstitutionally infringes the first amendment rights of applicants who are not seriously considered because they are not within this informal network.

In *Elrod v. Burns,* a newly elected Democratic Sheriff discharged Republican employees of the Cook County, Illinois Sheriff's Department. The sheriff required them to switch their allegiance to the Democratic party and agree to work for or contribute money to the Democrats. 427 U.S. at 355, 96 S.Ct. at 2680–81. The Supreme Court found that this practice violated the first amendment rights of the employees, but did not issue a majority opinion. The plurality (consisting of Justices Brennan, White and Marshall) found that two interests were implicated in the case: the individual employee's right to express political beliefs, and the interest of the political system in wide-open, robust and uninhibited debate. Thus, discharging employees because of their political affiliations was "tantamount to coerced belief," *id.,* and as such violated the fundamental interest in free competition in ideas by stifling debate and by granting one side a significant advantage in that competition. 427 U.S. at 355–56, 96 S.Ct. at 2680–81. Justice Stewart's concurrence, joined by Justice Blackmun, limited its scope and hence the court's holding (*see Marks v. United States,* 430 U.S. 188, 193, 97 S.Ct. 990, 993, 51 L.Ed.2d 260 (1977)) to nonpolicymaking, nonconfidential employees discharged because of political beliefs or affiliation. 427 U.S. at 375, 96 S.Ct. at 2690–91.

*Branti v. Finkel* clarified the Court's holding in *Elrod.* The Court went beyond *Elrod* to find the politically-motivated discharge of public employees improper except where "party affiliation is an appropriate requirement for effective performance of the public office involved." 445 U.S. at 518, 100 S.Ct. at 1295. In dissent Justice Powell argued that the historical place of patronage in American politics, and its importance in encouraging participation in the political process, made the patronage system worthy of more deference than the majority opinion showed. *Id.* at 521–34, 100 S.Ct. at 1296–03. Others have made the same argument. *See, e.g.,* Moeller, *The Supreme Court's Quest for Fair Politics,* 1 Const'l Commentary 203, 213–19 (1984) (endorsing Powell's approach); Piven, *Federal Policy and Urban Fiscal Strain,* 2 Yale L. & Pol'y Rev. 291, 302–11 (1984) (decline of patronage system in big cities has deprived minorities and poor of the opportunities for advancement and political participation it provided).

Although the informal hiring practices in question here place some burden on the associational rights of prospective job applicants, that burden does not rise to the level of a constitutional deprivation. Under the first amendment, government actions receive a much higher degree of scrutiny when those actions are aimed at restricting the content of speech than when the burden on the protected activity is an incidental consequence of other legitimate governmental concerns. *Compare Keyishian v. Board of Regents,* 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967) (invalidating statute restricting employment of communists) *with Kovacs v. Cooper,* 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513 (1949) (upholding limits on use of sound trucks in political campaigns) and *Prince v. Massachusetts,* 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944) (upholding application of child labor laws to use of children for distribution of religious literature). *See also* L. Tribe, American Constitutional Law 580–81 (1978). In the instant case the officials in question had no firm rule, regulation, or established policy foreclosing employment

based on political affiliation, but their hiring system had the effect of giving weight to party affiliation.

There is a significant difference between a patronage system that intentionally uses a strict political test as the standard for hiring or firing decisions, as in *Elrod, Branti, Keyishian, Mitchell* and *Wieman, supra,* and a patronage system that relies on family, friends and political allies for recommendations. The former has a single end tied to political belief. The latter has multiple purposes—finding good employees, maintaining and extending personal and political relationships, creating cooperation and harmony among employees. The former is designed to call attention to political differences and punish those who differ. The latter is designed to enhance the official's performance and political appeal. The former requires no weighing or balancing of factors by the elected official or the reviewing court. The latter takes into account many factors and nuances, conscious and unconscious, and its review would involve the federal courts in the complex and subjective hiring practices of elected officials at every level of government.

■ *Elrod* and *Branti* did not affect normal patronage hiring systems in the United States because they were strict political affiliation discharge cases. Invalidation of informal hiring networks like those in the instant case because they lead to disproportionate representation of one political party or to a disproportionate number of liberals or conservatives would require abolition of the hiring systems for office workers in thousands of legislative, executive, and judicial offices across the country. In order to prevent patronage under the present systems, the courts would have to constitutionalize a civil service system and oversee its operation. There is no precedent for this reading of the first amendment. Balancing the harm sought to be remedied—the tendency of present systems to prefer particular political parties in different offices—against the legitimate needs of elected officials to hire

in some manner effective employees who will not be blind to the public nature of the work and the political needs of their employer, we conclude that the hiring systems used by the defendants did not abridge plaintiff's rights of free speech under the first amendment. Accordingly, the judgment of the District Court is affirmed.