Brian Randall BARTON, Leona Fittro, Martha Barnes, Judith G. Farley, Donald P. Marziale, John T. Cooper, and Martha Dinkler, Plaintiffs,

v.

A. James MANCHIN, individually and as Treasurer of the State of West Virginia; and Charles E. Capet, individually and as Chief of Staff of the Treasurer's Office of the State of West Virginia, Defendants.

Sue Ann ZICKAFOOSE, Troy Hendricks, Gwendolyn Meadows, Denise Casto, and Jeffrey L. Atkins, Plaintiffs,

v.

A. James MANCHIN, individually and as Treasurer of the State of West Virginia; and Charles E. Capet, individually and as Chief of Staff of the Treasurer's Office of the State of West Virginia, Defendants.

Phyllis WHITE, Plaintiff,

v.

A. James MANCHIN, individually and as Treasurer of the State of West Virginia; and Charles E. Capet, individually and as Chief of Staff of the Treasurer's Office of the State of West Virginia, Defendants.

T. Carole WHITE, Plaintiff,

v.

A. James MANCHIN, individually and as Treasurer of the State of West Virginia; and Charles E. Capet, individually and as Chief of Staff of the Treasurer's Office of the State of West Virginia, Defendants.

Civ. A. Nos. 2:85–1187, 2:85–1229, 2:87–0003 and 2:87–1037.

United States District Court, S.D. West Virginia, Charleston Division.

Feb. 19, 1988.

Larry G. Kopelman, John R. Mitchell, Nicholas W. Johnson, Joseph C. Commetti, Charleston, W.Va., for plaintiffs.

Richard L. Earles, Charleston, W.Va., for defendants.

## MEMORANDUM ORDER

COPENHAVER, District Judge.

The complaints in these consolidated civil actions allege that defendants violated

plaintiffs' constitutional rights by terminating their employment with the West Virginia Treasurer's Office in January of 1985. This matter is before the court upon defendants' motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.[1]

### I. *Factual Background*

Plaintiffs were employees of the West Virginia Treasurer's Office under Larrie Bailey. Bailey, a Democrat, was elected to the office of Treasurer in 1976 and was re-elected in 1980. He sought a third term in 1984, but was defeated in the Democratic primary election by A. James Manchin. At the time of the primary, Manchin was serving as Secretary of State. Manchin was elected to the post of Treasurer in the general election held in November of 1984, and took office in January of 1985.

On January 3, 1985, prior to Manchin's inauguration, a letter of termination was sent to 34 employees of the Treasurer's Office. The letter bore the heading "A. James Manchin, Treasurer of State," and was signed by Charles E. Capet as "Chief of Staff–Designate." The letter stated in pertinent part that:

> As with any transition from one administration to another, certain reorganizations of staff are necessary to continue to provide the most efficient and effective public service possible under the new leadership.
>
> It is because of this reorganization that staff changes will conclude your public service in the Treasurer of State's Office as of the close of business on January 11, 1985. While your tenure will end on January 11, 1985, you will, of course, be paid for any accumulated annual leave. Please understand that only staff reorganization requires this action, which reflects in no way on your talents and capabilities. You have served the People of West Virginia well.

Deposition of Brian Randall Barton, Exhibit No. 1.

The plaintiffs in this action were among the employees receiving this letter.[2] Each letter was identical and none stated any other reason for the terminations.

Defendants in their brief assert that the terminations and reorganization were a result of the efforts of Manchin's post-election "transition team," consisting of Charles E. Capet, D. Jerry Simpson, John Pratt and Sue Cavender Bing.[3] The team had been directed by Manchin to review the organization and personnel of the Treasurer's Office. Simpson in particular was called upon to review both the operation of the office and the efficiency and work performance of the staff. According to defendants, "[t]he result of Mr. Simpson's efforts included an evaluation of the Treasurer's staff, identifying each staff member's responsibilities and job performance. Simpson also discussed reorganization of the Treasurer's office, incorporating plans which the Treasurer-elect had requested...." Defendants' Memorandum of Law in Support of Motion for Summary Judgment, pp. 5–6. Apparently, this review process was entirely oral, for the record before the court contains no written records pertaining to the review or the reorganization.

Plaintiffs, while not denying that staff changes occurred, argue that the purported reorganization was simply a sham used by defendants to replace employees hired by Bailey with Manchin's friends and supporters. Specifically, plaintiffs allege that:

> 12. There was no reorganization of the Treasurer's Office undertaken by the Defendants or their agents either before or after the dismissals. The only staff changes made by the Defendants and their agents entailed the dismissal of the Plaintiffs and others similarly situated and the hiring of political allies and co-

---

**1.** The closing brief on the last motion for summary judgment was filed February 16, 1988.

**2.** Plaintiff T. Carole White received this letter on September 16, 1985. It was identical to the January 3, 1985, letter except that "continuing

reorganization" was substituted for "reorganization."

**3.** Sam Cole was also a member of the transition team according to the depositions of the defendants.

horts of the Defendants to take their places in the same jobs. Thus, the reason given for the dismissals constituted a sham and pretext so as to allow the Defendants to engage in political hiring.

13. The Defendants dismissed the Plaintiffs because the Plaintiffs had, or were believed or presumed to have had, affiliations, political and otherwise, with either Larrie Bailey or with other political personages or groups whose interests were enimical [sic] to those of the Defendants.

14. The Defendant, A. James Manchin, did not legally become State Treasurer until January 14, 1985, and thus, had no legal capacity or authority to dismiss employees of the Treasurer's Office on January 11, 1985.

15. In all respects, the actions of the Defendants described herein were under color of state law.

16. As a result of the actions of the Defendants, the Plaintiffs were dismissed from their jobs and suffered loss of income, personal financial distress, mental pain and suffering, harm to reputation in the community, and annoyance and inconvenience.

Amended Complaint, ¶¶ 12–16.

Plaintiffs assert three causes of action based upon the foregoing allegations:

17. The actions of the Defendants described herein were intended to exact retribution upon the Plaintiffs for the exercise of their rights to freedom of speech and association and thus deprived the Plaintiffs of their First Amendment rights.

18. The dismissals of the Plaintiffs described herein were undertaken without procedural due process of law and thus deprived the Plaintiffs of their Fifth and Fourteenth Amendment rights.

19. The dismissals of the Plaintiffs described herein deprived them of their rights to equal protection under the laws as secured by the Fourteenth Amendment.

Amended Complaint, ¶¶ 17–19.

In support of these allegations, plaintiffs direct the court's attention primarily to the depositions of Manchin and the plaintiffs. Initially, plaintiffs observe that the composition of the transition team was not entirely clear. Though defendants' memorandum states that the team included only Charles Capet, Jerry Simpson, John Pratt and Sue Bing, Manchin and Capet both testified in their depositions that the team also included Sam Cole. Deposition of A. James Manchin, Vol. I, pp. 25–26; Deposition of Charles E. Capet, Vol. I, p. 46. Moreover, plaintiffs assert that the team's duties were unclear, meetings were infrequent, and nothing regarding the team's work was put into writing. Manchin testified as follows:

Q Did this group which consisted of Mr. Simpson and Mr. Capet and Mr. Pratt, did that group have a name or a particular designation?

A Not necessarily.

Q Were there any other individuals who—

A Not that I recall.

Q Okay.

A I do know that if they had other people working, I do know that Mr. Pratt and Mr. Simpson worked, and Mr. Capet.

Q Do you recall whether or not you ever met with the three of them together?

A No, I never did, not that I recall because you'll understand that I had to have, that my responsibilities were directed toward, as Treasurer–Elect I still had responsibilities as Secretary of State.

Q Was one of those three individuals more or less to operate as the head or as the chief of the transition effort?

A Well not necessarily. They were kind of working together.

Q As this group of three people—

A Transition.

Q (continuing) worked on the transition—

A Yes.

Q (continuing) was there any one of those three who had the responsibility to report back to you on a weekly or a periodic basis concerning the progress of their efforts?

A  Well Mr. Pratt is the one that always kind of made the reports to me.

Q  Okay.  Were any of his reports to you during that period of the transition prior—

A  Uh huh.

Q  Were any of the reports that he made to you during that period of time made in writing to you?  Do you remember?

A  No.  No, I had nothing in writing.

. . . .

Q  When did they finally come back to you with any specific recommendations for improvements in the Treasurer's Office?

A  Oh, I'd say, it seems like after the Christmas holidays or early in January when we got back after the new year.

Q  Were any recommendations that they gave to you put in written form?

A  Not that I recall.

Q  Were those recommendations given to you by the transition group in a group meeting in which all of the three of them attended?

A  No.

Q  How were those recommendations then transmitted to you?

A  Well they put their recommendations in fact, but I, it seems to me like Mr. Pratt discussed some of the ways to improve the operations.

. . . .

Q  Okay.  Can you remember whether or not Mr. Pratt or anybody else on the transition team ever came to you with a list of names whom they recommended needed fired or terminated?

A  I don't recall that, no.

Manchin Deposition, Vol. II, pp. 8–12.

Plaintiffs further assert that the process by which individuals were chosen for termination is uncertain, inasmuch as no written records remain.  Manchin himself apparently was somewhat removed from the process, testifying as follows:

Q  Mr. Manchin, how was it that the individuals who were informed in January of 1985 that their employment in the Treasurer's Office wouldn't be renewed, how were they specifically chosen to not be?

MR. EARLES:  If he knows.

THE WITNESS:  I would ask if—

MR. EARLES:  If you know.

THE WITNESS:  You would have to ask Jerry that.  They were the ones who made the recommendations.  I just said I want a good efficient staff, and I'll tell you one thing, I'm certainly pleased with their recommendations because I asked them to do it, you know.  Of course, I kind of keep the big flame burning.

BY MR. COMMETTI:

Q  Uh huh.

A  We have a lot of responsibilities.

Q  Did you consult with Mr. Capet or with any of the other two individuals, Mr. Pratt or Mr. Simpson about how many people—

A  Not at all.

Q  (continuing) would receive notices that they would not be renewed?

A  No.  I just wanted, as in every case, Jerry would have had knowledge, and you know, you probably do know and I think everybody knows, that in many cases, maybe in the business community as well, there is always excess, always. And what we try to do is to see if we couldn't have a more efficient office and maybe, and in reorganization sometimes we find out that people in certain positions should not be there.

Q  Did you review any of the names—

A  I did not.

Q  (continuing) prior to the time that they were informed?

A  I did not review no names.  As a matter of fact, I knew none of them.  I might have known one or two in the investments as a result of a lot of discussion on this Parkersburg bridge case, or the bonds.  I might have read a name, but outside of that, I had no knowledge of anyone that worked in this office at all.  So it was nothing personal.  There was nothing involved except the biggest part of the recommendations came from Jerry and our transition team, and I have great faith, confidence in them.

Q Mr. Manchin, you have referred to recommendations. Were these recommendations of people who should not be renewed in their employment? How did you get those recommendations?

A It was recommendations for an efficient operation, everything, how we could do better. That's, of course, that was our goal.

Q But were there specific recommendations as to specific individuals who should not be renewed in their employment?

A I think that Jerry would have that. I think that there were several; that was how they probably got these notices.

Q Mr. Manchin, were there specific recommendations made to you as to specific individuals—

A No.

Q (continuing) who should not be terminated?

A No. No.

Q Well who were the recommendations made to? Normally when one makes a, quote, recommendation, unquote, it's one person giving it to another person. What recommendations were made by whom, to whom, with regard to who should not be renewed for the employment?

A I think from the committee, the committee, and then the committee, and it was this letter, you see. That's why I asked them to look into it. I have no way of knowing who would be efficient, who would not, in the office. I just—

Q To whom were the recommendations made to by the committee? Were they made to you, Mr. Manchin?

A No. I'd seen them, but Mr. Capet was to be the Chief of Staff Designate, and Jerry was here and he knew exactly what area we should go in, and that's how it came about. And I thought it was a very good plan.

Manchin later testified that the team made recommendations regarding termination to Capet, who then made the actual decisions, although Manchin retained the final authority. Manchin Deposition, Vol. II, p. 22.

The true reason for the terminations, according to plaintiffs, was to make room for friends and supporters of Manchin. Plaintiff Judith Farley testified that upon receiving her letter of termination, she telephoned Capet and asked to know why she and others had been terminated. Capet allegedly replied that they needed "the spaces ... the slots." Farley testified as follows:

Q How did you come about calling? Did you just talk to anybody about making a call?

A No, I read the letter and I called.

Q Who did you call?

A I called Charlie Capet. That's who wrote the letter.

Q Over at the Secretary of State's office. You just called the same phone number that's right on the letter?

A On the letter.

Q And he was there?

A Uh-huh.

Q I'd like for you to tell me to the best of your recollection the dialogue, what you said and what he said, just step by step.

A Step by step?

Q Yes.

A Okay, I said, "Charlie, this is Judy." and he said, "Hello, how are you?" he said, "I guess you received the letter." I said, "Yes." He said, "I was shocked as much as you are because I didn't expect your name to be on the list." I said, "Well, why was my name on the list?" He said, "because we need your space, we need your slot."

Q What did you say to him, if anything, after he said that to you, "We need your space."?

A I repeated what he said. I said, "You need my slot?" and he said, "Yes." I said, I think I said something like, "Why is everyone in this particular office being fired at this time?" And he said, "We need the space. We need the spaces. We need the slots."

Deposition of Judith Farley, pp. 69–70.

Plaintiffs assert that the 34 newly-vacant positions were promptly filled with friends

and political allies of Manchin. Plaintiffs' memorandum lists 28 persons hired by Manchin shortly after the terminations, all of whom allegedly have some friendly or political tie to the new Treasurer.

## II. *Defendants' Motion for Summary Judgment*

■ The seminal decisions with respect to the issues presented in this action are *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980); and *Jones v. Dodson,* 727 F.2d 1329 (4th Cir.1984).

In *Elrod,* the Supreme Court addressed for the first time the specific issue of patronage discharges and held that certain non-civil service employees of a sheriff's office could not be dismissed because they were not affiliated with or sponsored by the political party of the current sheriff. A majority of the court held in plurality and concurring opinions that the First and Fourteenth Amendments prohibit the discharge of a nonpolicymaking, nonconfidential government employee on the sole ground of party affiliation. 427 U.S. at 367–68, 96 S.Ct. at 2686–87 (Brennan, J., plurality opinion); 427 U.S. at 375, 96 S.Ct. at 2690–91 (Stewart, J., concurring). Justice Brennan concluded the plurality opinion thusly:

> In summary, patronage dismissals severely restrict political belief and association. Though there is a vital need for government efficiency and effectiveness, such dismissals are on balance not the least restrictive means for fostering that end. There is also a need to insure that policies which the electorate has sanctioned are effectively implemented. That interest can be fully satisfied by limiting patronage dismissals to policymaking positions. Finally, patronage dismissals cannot be justified by their contribution to the proper functioning of our democratic process through their assistance to partisan politics since political parties are nurtured by other, less intrusive and equally effective methods. More fundamentally, however, any contribution of patronage dismissals to the democratic

process does not suffice to override their severe encroachment on First Amendment freedoms. We hold, therefore, that the practice of patronage dismissals is unconstitutional under the First and Fourteenth Amendments, and that respondents thus stated a valid claim for relief.

427 U.S. at 372–73, 96 S.Ct. at 2689.

Significantly, Justice Brennan noted that "[t]he Cook County Sheriff's practice of dismissing employees on a partisan basis is but one form of the general practice of political patronage. The practice also includes placing loyal supporters in government jobs that may or may not have been made available by political discharges." 427 U.S. at 353, 96 S.Ct. at 2679–80.

In *Branti,* the Supreme Court held that assistant public defenders could not be discharged on the basis of party affiliation. The Court clarified the circumstances in which a policymaking or confidential government employee may be dismissed on the basis of party affiliation, concluding that "the ultimate inquiry is not whether the label policymaker or confidential fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." 445 U.S. at 518, 100 S.Ct. at 1295. Thus the rule of *Elrod* and *Branti,* as expressed by the Fourth Circuit in *Jones,* is that a public employee may not be dismissed solely for reasons of political party affiliation unless party affiliation is an essential requirement for the effective performance of the employee's duties. 727 F.2d at 1334.

Both *Elrod* and *Branti* involved discharges that admittedly were based solely on political party affiliation. In *Jones,* the facts were not so clear. There, two employees of the Page County, Virginia, Sheriff's office brought an action under 42 U.S.C. § 1983 against the sheriff for wrongfully discharging them from the sheriff's department because of their political affiliations and expressions. The only undisputed fact was that the plaintiffs, both Democrats hired by an incumbent Demo-

cratic sheriff, were terminated by the Republican successor to that office. The reasons for the discharge and other issues were disputed by the parties, but were resolved by the jury in favor of the plaintiffs. After reviewing the evidence, the Fourth Circuit held as follows:

Without attempting an exegesis of all the relevant decisions ... we draw from those decisions the following principles critical to decision here.

*First,* the root principle, itself of relatively recent origin, is that a state cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression. *Keyishian v. Board of Regents,* 385 U.S. 589, 605–06 [87 S.Ct. 675, 684–85, 17 L.Ed.2d 629] (1967); *see Connick [v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)].

*Second,* under this general principle, a public employee may not be discharged for the expression of ideas on any "matter of legitimate concern," *Pickering v. Board of Education,* 391 U.S. 563 [88 S.Ct. 1731, 20 L.Ed.2d 811] (1968), whether in a public forum, *Id.,* or in a private conversation with the employer, *Givhan v. Western Line Consolidated School District,* 439 U.S. 410 [99 S.Ct. 693, 58 L.Ed.2d 619] (1979), unless the public employer's "interest in the effective and efficient fulfillment of its responsibilities to the public," outweighs the employee's interest in free expression of the ideas. *Connick,* [461] U.S. at [151–53, 103 S.Ct. at 1692–93].

Whether a particular expression was, in the first place, upon a matter of legitimate public concern is a question of law for the courts, *id.* at [148 & n. 7, 103 S.Ct. at 1690 & n. 7]; it is not a question of fact. If the expression was not upon a matter of legitimate public concern, no first amendment protection against discharge exists (though other first amendment protections may), *id.* at [147, 103 S.Ct. at 1690].

. . . .

*Third,* neither may a public employee be discharged solely because of the employee's political party affiliation, unless the employer can show that affiliation with the employer's party is essential to the employee's effectiveness in carrying out the responsibilities of the position held. *Branti v. Finkel,* 445 U.S. 507, 518 [100 S.Ct. 1287, 1294–95, 63 L.Ed.2d 574] (1980); *Elrod v. Burns,* 427 U.S. 347 [96 S.Ct. 2673, 49 L.Ed.2d 547] (1976).

*Fourth,* notwithstanding proof (or concession) that a public employee's discharge was based at least in part upon overt expressive conduct, party affiliation, or both, an employer may yet avoid liability for violation of protected first amendment rights by proving that the discharge would have been made in any event for reasons unrelated to any exercise of protected first amendment rights. *Mt. Healthy City Board of Education v. Doyle,* 429 U.S. 274 [97 S.Ct. 568, 50 L.Ed.2d 471] (1977). The burden to prove this avoidance defense is upon the public employer. *Id.* at 287 [97 S.Ct. at 576].

(Footnotes omitted).

■ Unlike *Elrod, Branti* and *Jones,* which involved terminations based on political affiliation to a party, this case involves terminations allegedly based on political allegiance, or lack of it, to a political candidate or officeholder. Employment requirements of political allegiance to a candidate or officeholder would seem to be subject to the same First Amendment considerations as requirements of affiliation to a party, and the rationale of *Elrod* and *Branti* has been applied with equal force to patronage dismissals when one faction of a party replaces another faction of the same party. *Tomczak v. City of Chicago,* 765 F.2d 633, 640 (7th Cir.), *cert. denied,* 474 U.S. 946, 106 S.Ct. 313, 88 L.Ed.2d 289 (1985); *Barnes v. Bosley,* 745 F.2d 501, 506 n. 2 (8th Cir.1984); *McBee v. Jim Hogg County, Texas,* 703 F.2d 834, 838 n. 1 (5th Cir.1983), *vacated on other grounds,* 730 F.2d 1009 (5th Cir.1984); *Stegmaier v. Trammel,* 597 F.2d 1027, 1032 n. 4 (5th Cir.1979); *Parker v. Wallace,* 596 F.Supp. 739 (M.D.Ala.1984); *Joyner v. Lancaster,* 553 F.Supp. 809 (M.D.N.C.1982); *Ecker v. Cohalan,* 542

F.Supp. 896 (E.D.N.Y.1982). *See also Rodriguez v. Munoz*, 808 F.2d 138, 139, 144–45 (1st Cir.1986); *Whited v. Fields*, 581 F.Supp. 1444 (W.D.Va.1984). In this regard, however, footnote 6 of the *Jones* opinion is significant. Referring to its third enunciated principle (a public employee may not be discharged solely because of the employee's political party affiliation, unless the employer can show that affiliation with the employer's party is essential to the employee's effectiveness in carrying out the responsibilities of the position held), the Fourth Circuit noted:

This deliberately states the *Elrod–Branti* principle in terms narrowly confined to the specific facts of those cases, each of which involved discharges concededly based only upon the employees' party affiliations. *We recognize that the principle might be thought to run as well to coerced political loyalty to individual employers (even of the same political party). See McBee v. Jim Hogg County*, 703 F.2d 834, 838 n. 1 (5th Cir.), *reh'g en banc granted*, 703 F.2d 834 (1983); *see also Connick*, [461] U.S. at [149], 103 S.Ct. at 1691 (*Elrod and Branti prohibit "pressure to work for political candidates not of the worker's own choice"*). The effect of such an extension of *Elrod–Branti* patronage discharge principles would be, however, necessarily to carry over to other discharges than those solely for party affiliation, the extremely narrow justification basis defined in *Branti*. We do not believe that test is suited to the "personal political loyalty" situation; it is too narrow. While it may adequately protect the only conceivable governmental interest in ensuring same-party affiliation of a public employee, it is not flexible or broad enough to protect governmental interests in avoiding a variety of employee "expressions" involving specific insubordination or dereliction of duty having a "political" tinge, or, conceivably, deliberately given a "political" cloak.

We therefore believe that raw patronage discharges of the *Elrod–Branti* type are properly treated as a narrow, special case within the wider category of first amendment discharges. Only in this narrow circumstance may the requisite balancing of governmental and individual interests appropriately be accomplished by the essentially rigid *Branti* inquiry. In the raw patronage situation both the individual and governmental interests are essentially fixed and unvarying in content. Balancing those interests from case to case does not require open-ended inquiry concerned with specific workplace relationships that may underlie overt expressive conduct. Where the protected activity involves overt "expression of ideas," the more open-ended inquiry prescribed by *Pickering* and its progeny are required to accomplish the necessary balancing.

727 F.2d at 1334–35 (emphasis supplied).

This case, like *Jones*, involves substantial areas in which the facts are in dispute. The only truly undisputed facts are that the plaintiffs, all Democrats hired by Larrie Bailey, were discharged in January of 1985 by A. James Manchin after he defeated Bailey in the 1984 Democratic primary election and went on to win the general election in November, 1984. The reasons for the terminations are disputed. Though defendants contend the terminations were simply part of a "reorganization" of the Treasurer's office, the evidence before the court supporting this contention, reviewed in Part I of this opinion, is modest at best. Moreover, an examination of the 1984 and 1985 editions of the West Virginia Blue Book reveals that under Bailey in 1984, the Treasurer's Office employed 64 persons, while under Manchin in 1985, the office employed 89 persons, an increase of 25. If the plaintiffs' terminations truly "reflected in no way on [their] talents and capabilities," as stated in the termination letters, perhaps the plaintiffs could have been reassigned to these additional positions, or to some other position within the department.

Finally, although defendants argue that "no evidence exists in the record in these two consolidated cases that plaintiffs have either alleged or offered any evidence that they themselves had openly supported Lar-

rie Bailey or opposed A. James Manchin," [4] a review of the record indicates otherwise. At least eleven of the fourteen plaintiffs testified in their depositions that they had campaigned for Larrie Bailey in the 1984 primary election.[5] Thus, it could be inferred that expressed political beliefs and affiliations played some role in the terminations. If defendants terminated plaintiffs for the reasons alleged, the terminations may have constituted factional patronage dismissals under those cases extending the reach of *Elrod* and *Branti,* as well as dismissals for protected overt expressive conduct of the *Pickering–Givhan–Connick* type.[6]

> In *Jones,* the court aptly foresaw that:
> A critical issue in this type case is therefore likely to be the threshold motivational one: for what reason[s] was the employee discharged? If raised by the evidence, this is quintessentially a factual issue. In some cases, *e.g.,* *Branti* and *Pickering,* the existence of a single, first amendment related motive—either raw patronage or overt expressive conduct—is essentially conceded, with defense being rested solely upon establishing the appropriate public-interest justification. In others, the evidence may only raise

issues respecting the existence of mixed motives—one related, the other unrelated to first amendment protections—with the sole question being whether the unrelated motive was an independently effective one.

727 F.2d at 1336.

It is precisely that threshold motivational issue that is critical here and is in dispute. It is a factual issue and on the record before the court, it is far from clear. Consequently, the court finds that there are genuine issues of material fact and, hence, summary judgment is inappropriate.[7]

### III. Conclusion

For the foregoing reasons, it is ORDERED that defendants' motions for summary judgment be, and they hereby are, denied.

The Clerk is directed to forward certified copies of this order to all counsel of record.

**4.** Defendants' Memorandum of Law in Support of Motion for Summary Judgment, p. 15.

**5.** *See* following depositions: Brian Randall Barton, pp. 24, 28–29, 110; Leona Fittro, pp. 40–43, 68–69; Donald P. Marziale, pp. 5–6, 39–40; Lynn Gooden, pp. 17–18; John T. Cooper, pp. 18–25; Sue Ann Zickafoose, pp. 107–09; Troy Hendricks, pp. 10, 46–47, 82; Gwendolyn Meadows, pp. 40–44; Denise Casto, pp. 8–10; Martha Dinkler, pp. 22–26; and T. Carole White, p. 52.

**6.** *See Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *Givhan v. Western Line Consolidated School District,* 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979); *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983).

**7.** Defendants, relying on *Avery v. Jennings,* 786 F.2d 233 (6th Cir.1986), attempt to characterize this as a political hiring case at best, as opposed to a political firing case. But while plaintiffs certainly have alleged that they were replaced by political hires, the plaintiffs were fired prior to the alleged political hires. *Avery* was solely a political hire case—no one was fired.

In *Avery,* the defendants were three Republican county officials. The plaintiff, a Democrat, applied without success to each for a clerical job as a secretary, clerk, or office helper. She was not terminated from any job by the defendants prior to her application, nor had she engaged in any overt expressive conduct in opposition to the defendants. The court found that "[i]n the instant case, the officials in question had no firm rule, regulation or established policy foreclosing employment based on political affiliation, but their hiring system had the effect of giving weight to political affiliation." 786 F.2d at 236–37. The court concluded that "this system did not abridge plaintiff's rights of free speech under the first amendment."

By contrast, the present case involves allegations of not only political hirings, but also political firings, perhaps based on overt expressive conduct. In sum, though *Avery* may have some application to the present case, the factual differences outlined render that application questionable. Moreover, while the *Avery* court found no First Amendment violation on the particular facts of that case, the court noted that the First Amendment does "prohibit official hiring practices based solely on political affiliation." 786 F.2d at 234.