Cynthia RUTAN, et al.,
Plaintiffs–Appellants,

v.

REPUBLICAN PARTY OF ILLINOIS, et al., Defendants–Appellees.

No. 86–2073.

United States Court of Appeals, Seventh Circuit.

Argued April 7, 1988.

Decided June 8, 1988.

Rehearing Granted Aug. 17, 1988.*

---

* Judgment and opinion vacated.

Mary Lee Leahy, Leahy & Leahy, Springfield, Ill., for plaintiffs-appellants.

Thomas P. Sullivan, Jenner & Block, Chicago, Ill., for defendants-appellees.

Before COFFEY, RIPPLE and MANION, Circuit Judges.

MANION, Circuit Judge.

Plaintiffs appeal the district court's dismissal of their complaint challenging a public employer's use of political considerations in hiring, rehiring, transferring, and promoting employees. *See Rutan v. Republican Party of Illinois*, 641 F.Supp. 249 (C.D.Ill.1986). We affirm in part, reverse in part, and remand.

## I.

### NATURE OF THE CASE

The basis of plaintiffs' complaint is that Governor James R. Thompson of Illinois, the Republican Party of Illinois, and various state and Republican Party officials use political considerations in hiring, rehiring from layoffs, transferring, and promoting state employees under Governor Thompson's jurisdiction. Because we are reviewing the district court's dismissal of the complaint for failure to state a claim upon which relief can be granted, we take the allegations in the complaint as true. *See LaSalle National Bank of Chicago v. County of DuPage*, 777 F.2d 377, 379 (7th Cir.1985), *cert. denied*, 476 U.S. 1170, 106 S.Ct. 2892, 90 L.Ed.2d 979 (1986).

According to the complaint, approximately 60,000 state employees work in more than fifty "departments, boards and commissions under the jurisdiction" of Gover-

nor Thompson. On November 12, 1980, Governor Thompson issued an executive order "which requires his personal approval or that of a designee before any individual may be hired or promoted...." The executive order, which is attached to the complaint, states:

### HIRING FREEZE

Effective at the close of business today, November 12, 1980, no agency, department, bureau, board or commission subject to the control or direction of the Governor shall hire any employee, fill any vacancy, create any new position or take any other action which will result in increases, or the maintenance of present levels, in State employment, including personal service contracts. *All hiring is frozen.* There will be *no* exceptions to this order without my express permission after submission of appropriate requests to my office.

(Emphasis in original.) Governor Thompson has assigned power over significant employment decisions to the "Governor's Office of Personnel." Plaintiffs contend that the employment decisions made by the Governor's Office of Personnel are:

... substantially motivated by political considerations. Such political considerations include whether the individual under consideration is Republican or a relative or friend of a Republican, is sponsored by an influential Republican, is a financial supporter of the Republican Party or an influential Republican, is a friend or supporter of Defendant Thompson or is sponsored by those who are friends or supporters of Defendant Thompson or is sponsored by a member of the Illinois General Assembly who is deemed to be a friend or supporter of Defendant Thompson.

This patronage employment system, plaintiffs claim, creates a significant political advantage "in favor of the 'ins,' i.e., Defendant James Thompson and his political allies, and against the 'outs,' i.e., those who may wish to challenge in elections."

The defendants are Governor Thompson, the Illinois Republican Party, seven current or former state officials and two Republican Party officials. Plaintiffs sued two of the state officials as class representatives, one as a representative of all "Directors, Heads or Chief Executive Officers ... since February 1, 1981" of state agencies under the Governor's jurisdiction and the other as a representative of all persons who acted as "liaisons" between those state agencies and the Governor's Office of Personnel. Plaintiffs sued the Republican Party officials as representatives of the class of "all Republican State Central Committee and County Central Committee officials and members ... since February 1, 1981."

Plaintiffs brought this action both as individuals and as representatives of six different classes. These classes are: (1) voters; (2) taxpayers; (3) politically unacceptable employees denied promotions; (4) politically unacceptable employees denied transfers; (5) politically unacceptable employees who have not been rehired after being laid off; and (6) politically unacceptable employment applicants who have applied for but not received a job.

Plaintiff Cynthia Rutan has worked for the Department of Rehabilitative Services since 1974. She has neither been active in the Republican Party nor supported Republican candidates. Since 1981, Rutan has applied for promotion into supervisory positions in the Department of Rehabilitative Services. Defendants allegedly filled each of these supervisory positions with someone less qualified but "favored on a political basis by the Governor's Office of Personnel." Rutan sued on her own behalf and as a class representative of those denied promotions as a result of the patronage system.

Plaintiff Franklin Taylor works for the Department of Transportation. He does not support the Republican Party. In 1983, Taylor applied for a promotion. A less qualified person, whom the Fulton County Republican Party supported, received the promotion. Taylor subsequently requested a transfer to a different county. Taylor was allegedly advised that he was not transferred because the Republican Party

Chairmen of Fulton and Schuyler Counties opposed the transfer. He sued on his own behalf and as a class representative of those denied promotions and transfers as a result of the patronage system.

Plaintiff Ricky Standefer was hired in a temporary position at the State Garage in Springfield in May, 1984. In November of that year, he and five other employees were laid off. The five other employees, who had Republican Party support, were offered other state jobs. Standefer, who had voted in the Democratic Party primary, was not. He sued on his own behalf and as a class representative of those who, as a result of the patronage system, have not been rehired after being laid off.

Plaintiff Dan O'Brien was employed as a "Dietary Manager I" at the Department of Mental Health and Developmental Disabilities' Lincoln Development Center. O'Brien has voted only once in a primary, and that was in a Democratic Party primary. O'Brien was laid off on April 5, 1983. Under the "rules of the Department of Central Management Services," a laid off employee can be recalled within two years. If recalled, the employee's benefits continue and he does not lose seniority. "[R]ecall within that time period means no loss of seniority and continuation of other employment benefits." In December of 1984, an administrator at the Lincoln Development Center told O'Brien that he would be recalled. The administrator stated, however, that he was waiting to receive the necessary exception to Governor Thompson's hiring freeze. In February of 1985, O'Brien was told that the Governor's Office had denied him an exception to the freeze. "Several months" after being laid off, O'Brien attempted to and "ultimately" did receive employment with the Department of Corrections. He obtained this job after obtaining the support of the Chairman of the Logan County Republican Party. This job paid less money than his previous job. O'Brien sued on his own behalf and as a class representative of those who, as a result of the patronage system, have not been rehired after being laid off.

Plaintiff James Moore "has sought employment with the State of Illinois particularly with the Department of Corrections" since 1978. In 1980, Moore received a letter from a Republican state representative informing him that he would have to "receive the endorsement of the Republican Party in Pope County before I can refer your name to the Governor's office." Moore alleges that while he was attempting to obtain a position with the State, "the son of the current Chairman of the Pope County Republican Central Committee, ... the son-in-law of the Vice–Chairman and precinct committeewoman of the Pope County Republican Central Committee," and a Republican precinct committeeman were hired by the State in positions for which Moore was qualified. Moore sued on his own behalf and on behalf of all those denied employment as a result of the patronage system.

Plaintiffs also brought claims as voters and taxpayers. They claimed to represent a class of voters "who are entitled to cast their votes and use the election process to change and influence the direction of government and who have an interest in having a voice in government of equal effectiveness with other voters." They also claimed to represent a class of taxpayers who "are entitled to have monies provided by the taxpayers of Illinois spent only for State purposes and not spent on the operation and maintenance of a State political patronage system." As voters, plaintiffs claimed that the patronage system has diminished the value of their votes, thus denying them "a voice in government of equal effectiveness with other voters." As taxpayers, plaintiffs claimed to have been deprived of tax "monies ... which have been expended for the support of the patronage system and not for a governmental purpose."

Plaintiffs sought relief under numerous federal and state law theories. *See Rutan*, 641 F.Supp. at 252–59. On appeal we are concerned with two: (1) their claims as employees or potential employees that the patronage system violated their rights under the First Amendment as applied to the states through the Fourteenth Amendment;

and (2) their claims as voters that the patronage employment system violated the Fourteenth Amendment by denying them equal access and effectiveness in elections.[1] In their prayer for relief, plaintiffs sought over a billion dollars in damages and requested that the district court transfer the Governor's control over the state employment system to a federal receiver.

Defendants moved to dismiss the complaint under Fed.R.Civ.P. 12(b)(6) on the ground that it failed to state a claim for relief. The district court granted defendants' motion. *See Rutan*, 641 F.Supp. 249 (C.D.Ill.1986). This appeal ensued.

## II.

## ANALYSIS

A. *The District Court's Nonconsideration Of The Class Action Question.*

Before addressing the substantive issues raised on this appeal, we must first address the district court's failure to consider whether plaintiffs may properly bring this case as a class action. The district court dismissed the complaint under Fed.R. Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted but did not first consider whether the action may be properly brought as a class action. This violates Fed.R.Civ.P. 23(c)(1), which requires the district court to address the issue of class certification "as soon as practicable." *See Hickey v. Duffy*, 827 F.2d 234, 237 (7th Cir.1987); *Bennett v. Tucker*, 827 F.2d 63, 66–67 (7th Cir.1987). The district court's failure to address the class action issue does not deprive us of jurisdiction under 28 U.S.C. § 1291. The district court's order dismissed the suit in its en-

tirety, leaving nothing to be decided in that court. *See Hickey*, 827 F.2d at 238; *see also Gomez v. Illinois State Board of Education*, 811 F.2d 1030, 1034 n. 1 (7th Cir. 1987). Thus, even though the district court should have addressed the class action issue, its failure to do so does not destroy the finality of its decision.

The failure to address the class action issue, however, does limit the scope of our judgment. Because no class of plaintiffs or defendants was certified, only the named plaintiffs and named defendants are before this court. *See Hickey*, 827 F.2d at 238 (citing *Board of School Commissioners v. Jacobs*, 420 U.S. 128, 130, 95 S.Ct. 848, 850, 43 L.Ed.2d 74 (1975)). Therefore, we treat plaintiffs' claims as being brought solely by the named plaintiffs against the named defendants. *See Roberts v. American Airlines, Inc.*, 526 F.2d 757, 762–63 (7th Cir.1975), *cert. denied*, 425 U.S. 951, 96 S.Ct. 1726, 48 L.Ed.2d 195 (1976); *see also Pharo v. Smith*, 621 F.2d 656, 663–64 (5th Cir.), *rehearing granted in part and modified on other grounds*, 625 F.2d 1226 (5th Cir.1980) (per curiam).

B. *Patronage Employment Claims*

Plaintiffs' employment claims challenge the validity of a longstanding feature of the American political landscape. They each claim that they did not receive some favorable employment decision because the defendants' employment decisions were substantially motivated by political considerations. Plaintiffs argue that the defendants placed an unconstitutional burden on their freedom of belief and association guaranteed by the First Amendment by relying upon political considerations in making employment decisions. *See Rob-*

---

**1.** In the portion of their brief denominated "Statement of Questions," plaintiffs did purport to raise an equal protection claim in their capacities as employees and employment applicants. Plaintiffs' employment claims, however, rise and fall on their First Amendment claims because the arguments in the brief are argued solely under the First Amendment. Whatever its merits, plaintiffs' failure to argue their equal protection claim waived that claim. *See Sanchez v. Miller*, 792 F.2d 694, 703 (7th Cir.1986), *cert. denied*, — U.S. ——, 107 S.Ct. 933, 93 L.Ed.2d 984 (1987).

Plaintiffs also appeal the district court's dismissal of their state law claims brought as taxpayers for lack of pendent jurisdiction. Because we remand the employment claims of four plaintiffs, the district court should consider on remand whether it should exercise pendent jurisdiction over those state law claims. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). Any consideration of those claims should also, as with all claims brought in federal court, analyze whether plaintiffs have standing to bring those claims.

*erts v. United States Jaycees,* 468 U.S. 609, 623, 104 S.Ct. 3244, 3252, 82 L.Ed.2d 462 (1984) ("Freedom of association ... plainly presupposes a freedom not to associate.") On the other hand, defendants argue that the district court properly dismissed plaintiffs' claims because the First Amendment does not require absolute political neutrality by a public employer in making employment decisions. According to defendants, public employer patronage practices violate the First Amendment only if an employee whose party affiliation is not a necessary requirement for his job is discharged or threatened with discharge. Thus, we must resolve two issues in addressing these claims: (1) whether, and to what extent, a public employer may take political affiliation into account in making employment decisions; and (2) whether, under the appropriate substantive rule, the district court properly dismissed plaintiffs' claims.

For years, the hiring and retention of public employees rested exclusively within the realm of legislative and executive discretion. A public employee's challenge to a particular employment practice that affected his free expression was met with Justice Holmes' famous pronouncement as a member of the Supreme Judicial Court of Massachusetts that, "[a policeman] may have a constitutional right to talk politics, but he has no constitutional right to be a policeman." *McAuliffe v. Mayor of New Bedford,* 155 Mass. 216, 220, 29 N.E. 517, 517 (1892); *see generally Connick v. Myers,* 461 U.S. 138, 143–44, 103 S.Ct. 1684, 1688, 75 L.Ed.2d 708 (1983). The latter half of this century has seen a broad expansion of the rights of employees and a corresponding diminution of the discretion exercised by the legislative and executive branches of government. *See Connick,* 461 U.S. at 143–47, 103 S.Ct. at 1688–90. The Supreme Court has struck down state laws that required public employees to take an oath denying past or present affiliation with the Communist Party, or other "subversive" organizations, *Wieman v. Updegraff,* 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952), as well as laws that barred members of the Communist Party and other "subversive" organizations from state employment, *Key-*

*ishian v. Board of Regents,* 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967). Other cases have firmly established that a public employee may not be discharged for speaking out on matters of public concern. *See, e.g., Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). Moreover, retribution short of discharge that is directed at an employee's speech has also been held to violate the First Amendment. *See Bart v. Telford,* 677 F.2d 622, 625 (7th Cir.1982).

Although broad, public employees' First Amendment rights are not absolute. The First Amendment requires an employee's interest in free expression to be balanced against the legitimate interests of the state served by the challenged practice. *See Pickering,* 391 U.S. at 568, 88 S.Ct. at 1734; *cf. Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). Thus, discharging an employee whose complaints about the workplace disrupt the workplace and undermine a supervisor's authority does not violate the First Amendment. *See Connick,* 461 U.S. at 150–54, 103 S.Ct. at 1691–93 (1983). Similarly, public employer work rules that are legitimately related to the workplace's effective functioning and "not aimed at particular parties, groups or points of view" do not violate the First Amendment even though the rules may negatively affect employees' speech or political association. *See Civil Service Comm'n v. Nat'l Assoc. of Letter Carriers,* 413 U.S. 548, 564, 93 S.Ct. 2880, 2889, 37 L.Ed.2d 796 (1973) (upholding Hatch Act restrictions on political activities by federal employees); *cf. Bart,* 677 F.2d at 624–25 (upholding rule requiring employee-candidate to take leave of absence while campaigning).

There are few areas where the balancing of interests under the First Amendment analysis is more sharply debated, or more uncertain, than the area of political patronage in employment. The Supreme Court first addressed the validity of patronage employment practices in *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). In *Elrod,* the newly-elected sheriff of Cook County, Illinois, a Democrat, suc-

ceeded a Republican in that office. The new sheriff discharged some of the incumbent employees and threatened to discharge others because they were not affiliated with or sponsored by the Democratic Party. A divided Supreme Court held that this practice violated the First Amendment.

Drawing heavily upon *Keyishian* and *Pickering*, a plurality of three justices stated that the patronage dismissals unnecessarily restricted political belief and association and that "any contribution of patronage dismissals to the democratic process does not suffice to override their severe encroachment on First Amendment freedoms." 427 U.S. at 372–73, 96 S.Ct. at 2689 (plurality). Although generally unimpressed with patronage practices, the plurality did limit its consideration of the issues to patronage dismissals and not to other patronage practices. *Id.* at 353, 96 S.Ct. at 2679 (plurality). Moreover, Justice Stewart's concurrence (in which Justice Blackmun joined) expressly limited the Court's holding to cases where, solely on the basis of political belief, a nonpolicymaking, nonconfidential employee is discharged or threatened with discharge from a job that he is satisfactorily performing. 427 U.S. at 375, 96 S.Ct. at 2690 (Stewart, J., concurring).

The Court next addressed patronage employment in *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), and slightly modified its holding in *Elrod*. In *Branti*, two Republican assistant public defenders sued after a newly-elected Democratic public defender threatened them with discharge. The Court ruled for the assistants, holding that a public employer cannot discharge an employee based on party affiliation unless "party affiliation is an appropriate requirement for the effective performance of the public office involved." *Id.* at 518, 100 S.Ct. at 1295. Again, the Court expressly limited its consideration of the issues to patronage dismissals. *Id.* at 513 n. 7, 100 S.Ct. at 1292 n. 7.

In light of the limited nature of the Supreme Court's holdings in *Branti* and *Elrod*, the courts of appeals have been gener-

ally hesitant to extend the rule enunciated in those cases. In *LaFalce v. Houston*, 712 F.2d 292 (7th Cir.1983), *cert. denied*, 464 U.S. 1044, 104 S.Ct. 712, 79 L.Ed.2d 175 (1984), this circuit affirmed the dismissal of a complaint filed by a contractor who brought suit alleging that a mayor violated the contractor's First Amendment rights by rejecting the contractor's bid for a city contract because the contractor did not support the mayor politically. In reaching its conclusion, the *LaFalce* court balanced the interference with political expression caused by the patronage practice against "the consequences of trying to prevent [the interference] through an interpretation of the Constitution." *Id.* at 293–94.

The court first found that a contractor's loss of a particular bid was less disruptive than an employee's loss of a job; a contractor still has other potential contracts to bid on. Moreover, the interference was not likely to affect many businesses, given that most stay on good terms with all major political parties. *Id.* at 294.

The court then determined that the costs of attempting to interfere with the patronage practices outweighed any interference with political affiliations.

[A]gainst the uncertain benefits of such a rule in promoting the values of the First Amendment must be set the unknown but potentially large costs. To attempt to purge government of politics to the extent implied by an effort to banish partisan influences from public contracting will strike some as idealistic, others as quixotic, still others as undemocratic, but all as formidable. Patronage in one form or another has long been a vital force in American politics. Civil service laws, ... requiring public contracts to be awarded to the low bidder, laws regulating the financing of political campaigns, and decisions such as *Elrod* and *Branti* have reduced the role of patronage in politics but have not eliminated it entirely. The desirability of reducing it still further raises profound questions of political science that exceed judicial competence to answer....

*Id.* The court also expressed concern that public officials would be subject to suit by disappointed bidders each time the city awarded a bid. Finally, the court expressed reluctance to "take so big a step in the face of the Supreme Court's apparent desire to contain the principle of *Elrod* and *Branti.*" *Id.* at 294–95; *see also Horn v. Kean,* 796 F.2d 668 (3d Cir.1986) (en banc) (partisan dismissal of motor vehicle agents who were independent contractors, not employees, held not to violate First Amendment); *Sweeney v. Bond,* 669 F.2d 542 (8th Cir.) (partisan dismissals of "fee agents" who were independent contractors held not to violate First Amendment), *cert. denied,* 459 U.S. 878, 103 S.Ct. 174, 74 L.Ed.2d 143 (1982).

In the employment context, the courts of appeals have extended *Branti* and *Elrod* beyond outright discharges and threats of discharges. For example, the courts have held that a partisan decision not to allow an employee to retain his job after the employee's "official" term of employment expires may violate the First Amendment. *See, e.g., McConnell v. Adams,* 829 F.2d 1319 (4th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1731, 100 L.Ed.2d 195 (1988); *Cheveras Pacheco v. Rivera Gonzalez,* 809 F.2d 125 (1st Cir.1987); *Furlong v. Gudknecht,* 808 F.2d 233 (3d Cir.1986); *McBee v. Jim Hogg County,* 730 F.2d 1009 (5th Cir.1984) (en banc). An open question remains, however, over whether burdens imposed by a patronage system rise to the level of a constitutional violation in situations that are not equivalent to the loss of employment.

In *Delong v. United States,* 621 F.2d 618 (4th Cir.1980), the Fourth Circuit limited employees' challenges to patronage practices to those practices that "can be determined to be the substantial equivalent of dismissal." *Id.* at 624. In that case, the plaintiff, a Republican, challenged his transfer and reassignment from his position as State Director of the Farmers Home Administration in Maine to a position as a project assistant in Washington, D.C. The plaintiff had been transferred and reassigned as part of a policy of the Secretary of Agriculture to replace Republican state directors with Democrats.

The district court granted the government summary judgment on the ground that plaintiff's position as a state director was a "policymaking" position. On appeal, the Fourth Circuit reversed and remanded the case to be considered under *Branti*'s newly articulated test that "party affiliation is an appropriate requirement for the effective performance of the public office involved." *Delong,* 621 F.2d at 622. In so holding, the court rejected the government's argument that the patronage reassignment and transfer of an employee protected under *Branti* and *Elrod* could never constitute an unconstitutional burden upon an employee's beliefs and associations. The court did, however, limit such challenges to those patronage practices which, while not an actual or threatened discharge, could be considered tantamount to a dismissal. *Id.* at 623–24. In pertinent part the court reasoned:

Dismissal or the threat of dismissal for political patronage reasons is of course the ultimate means of achieving by indirection the impermissible result of a direct command to a government employee to cease exercising protected rights of free political association and speech. This is *Elrod*'s and *Branti*'s specific, narrow application of the principle. We believe that when the principle is applied to patronage practices other than dismissal it is rightly confined to those that can be determined to be the substantial equivalent of dismissal.

In applying the principle, so limited, to the actual or threatened reassignment or transfer of a government employee, the issue thus becomes whether the specific reassignment or transfer does in fact impose upon the employee such a Hobson's choice between resignation and surrender of protected rights as to be tantamount to outright dismissal. This much and no more, we conclude, is a necessary implication from the broader principle drawn upon in *Elrod....* It is obvious that not every reassignment or transfer can fairly be thought to have this quali-

ty. It is equally obvious that in practical terms some might.

*Id.*

The "substantial equivalent of dismissal" standard focuses on the same question presented in constructive discharge cases, that is, whether a particular patronage decision would lead a reasonable person in the plaintiff's position to feel compelled to leave his job. *See, e.g., Parrett v. City of Connersville,* 737 F.2d 690 (7th Cir.1984), *cert. dismissed,* 469 U.S. 1145, 105 S.Ct. 828, 83 L.Ed.2d 820 (1985). In the course of most, if not all, persons' employment there are a wide variety of disappointments and possibly some injustices. Most of these are normal incidents of employment that could not be said to lead a reasonable person to quit. *See Bristow v. The Daily Press, Inc.,* 770 F.2d 1251, 1256 n. 4 (4th Cir.1985) (denial of promotion in and of itself cannot constitute a constructive discharge), *cert. denied,* 475 U.S. 1082, 106 S.Ct. 1461, 89 L.Ed.2d 718 (1986); *Schaulis v. CTB/McGraw–Hill, Inc.,* 496 F.Supp. 666 (N.D.Cal.1980) ("An employer has not effected a constructive discharge merely because an employee believes that she has ... limited opportunities for advancement...."). However, whether a particular action can be viewed as "substantially equivalent to a dismissal" (or a constructive discharge) is not subject to hard and fast rules. All the circumstances of a case must be taken into account.[2] Being placed in a sinecure may be some employees' idea of the ultimate job. For other employees, enforced idleness may be a humiliating experience as well as one that may permanently impair their professional skills. *See Parrett,* 737 F.2d at 694. Moreover, there may be special circumstances that sharply increase the severity of impact of what might otherwise be viewed as a routine employment decision. Under the *Delong* analysis these may all be taken into ac-

count. *Delong,* 621 F.2d at 624. The ultimate issue remains, however, whether a particular patronage decision "imposed so unfair a choice between continued employment and the exercise of protected beliefs and associations as to be tantamount to the choice imposed by threatened dismissal." *Id.*

In contrast to the Fourth Circuit's analysis in *Delong,* the Third Circuit has recently held that the rule enunciated in *Branti* and *Elrod* extends to any "disciplinary action" by a public employer. In *Bennis v. Gable,* 823 F.2d 723 (3d Cir.1987), a group of police officers brought suit against several defendants. The officers alleged that the defendants demoted them for engaging in political activity, or alternatively, that the defendants demoted them to make room for the new mayor's political supporters. On appeal, the defendants argued that the plaintiffs' claims that they were demoted to make room for political supporters failed as a matter of law. The defendants contended that the rule enunciated in *Branti* and *Elrod* was strictly limited to patronage discharges and did not extend to practices that placed lesser burdens on the plaintiffs' associational interests. The Third Circuit rejected both this argument and the "substantial equivalent to dismissal" standard set forth in *Delong. Id.* at 731 n. 9. According to the Third Circuit, the rule enunciated in *Elrod* and *Branti* was not limited by the harshness of a particular action but rather extended to the imposition of any "disciplinary action" imposed for the exercise of First Amendment rights. *Id.* at 731.

■ *Delong* and *Bennis* enunciate significantly different standards for analyzing patronage claims. *Delong* limits the rule enunciated in *Branti* and *Elrod* to constructive discharges. On the other hand, *Bennis* apparently extends the rule to a

---

**2.** Many constructive discharge cases in the employment discrimination area have required that the employer specifically intend for an employee to resign. *See, e.g., Bristow,* 770 F.2d 1251, 1255 (4th Cir.1985) (ADEA). This appears to be an open question in this circuit. *See Henn v. National Geographic Society,* 819 F.2d 824, 829 (7th Cir.) (ADEA), *cert. denied,* —— U.S.

——, 108 S.Ct. 454, 98 L.Ed.2d 394 (1987). *Delong* does not place any such requirements in patronage cases, nor do we think it would be appropriate to do so. *Branti, Elrod,* and *Delong* all focus on the burden a patronage system places on an employee, not on the employer's intent to impose the burden.

wide range of employment decisions, including decisions concerning routine transfers and promotions. We believe the *Delong* analysis is more sound.[3]

*Delong* properly extends the protections of *Branti* and *Elrod* beyond the narrow holdings of those cases to protect employees from patronage practices that may, as a practical matter, impose the same burden as the employees' outright termination. The *Delong* analysis, however, also properly takes into account the limited nature of the Court's holdings in *Branti* and *Elrod* and the fact that real differences exist between dismissals and other patronage practices. It also takes into account the substantial intrusion of the federal courts into the political affairs of the states as well as the executive and legislative branches of the federal government that would necessarily flow from extending *Branti* and *Elrod* beyond constructive discharges.

By favoring political supporters or those who are connected with political supporters, a patronage system will unquestionably have some negative effects on those persons who do not support or are not connected with the party or faction in power. The partisan denial of a promotion, transfer, or employment application leaves someone in a worse position than he would have been absent patronage considerations. At the same time, however, the burden imposed by such patronage decisions is much less significant than the loss of a job.

While we recognize that in a certain economic sense a person may be harmed as much by the failure to win a job as by the failure to keep one, we follow the plurality's approach in *Wygant v. Jackson Board of Education,* 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986). There the plurality stated that an affirmative action plan's discriminatory effects may be justified when it involves the loss of future employment opportunity but not when it involves the loss of a present position. The plurality

---

**3.** In adopting the *Delong* analysis, we recognize that language in *Hermes v. Hein,* 742 F.2d 350 (7th Cir.1984), indicates that a public employer may never take political factors into account. In *Hermes* two police officers alleged that they were denied promotions because eligibility tests and examination scores were "rigged" to favor other candidates who had local political support. The district court granted summary judgment on the ground that there was no evidence that political affiliations entered into the decisions. On appeal, this court stated that "the district court's grant of summary judgment ... will be sustained if the only reasonable inferences from the record are that [the allegedly politically-favored candidates] would have been promoted regardless of their political affiliations." 742 F.2d at 353. The court then affirmed the grant of summary judgment.

Defendants here distinguish *Hermes* on the ground that *Hermes* involved elements of retaliation, that is, "rigged" test scores and eligibility lists. We do not find that distinction persuasive. Whatever the effect such conduct may have on other rights, we do not believe the First Amendment issue turns on whether political factors are taken into account in an underhanded manner. Nonetheless, the language in *Hermes* does not control this case. The holding of a previous panel of this circuit is binding on other panels. Dictum is not. *See generally United States v. Crawley,* 837 F.2d 291 (7th Cir. 1988). And the language in *Hermes* must be considered dictum. Because of its summary disposition of the case the panel did not, nor did it need to, test the merits of an extension of *Branti* and *Elrod.* The panel merely cited *Branti* and *Elrod* in a footnote for the undisputed proposition that the right not to associate is protected under the First Amendment. There is no discussion of the reluctance expressed in *LaFalce* to extend the holdings of *Branti* and *Elrod* or of the Fourth Circuit's decision in *Delong.* There is also no indication that, on appeal, the defendants challenged any unprecedented expansion of *Branti* and *Elrod.* If the patronage issue was necessary to its holding, the court would have gone into these issues in great detail. Moreover, we note that *Hermes* has not been cited in any patronage case decided by other circuits. Accordingly, because the language contained in *Hermes* is dictum, it does not control this case.

Furthermore, contrary to plaintiffs' suggestion, *Danenberger v. Johnson,* 821 F.2d 361 (7th Cir.1987), does not support the proposition that patronage promotion decisions always violate the Constitution. In *Danenberger* the court upheld the dismissal of the plaintiff's complaint on the grounds of qualified immunity because no clearly established right to a promotional decision free of any political considerations existed at the time of the challenged promotion decision. *Id.* That the claim was dismissed on qualified immunity grounds in no way implies that such a constitutional right exists, *see Benson v. Allphin,* 786 F.2d 268, 279 n. 26 (7th Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 172, 93 L.Ed.2d 109 (1986); it means only that there is no right, or *if* there is a right, it was not clearly established at the time at issue.

reasoned that losing an employment opportunity is not as intrusive as losing an existing job. *Wygant*, 476 U.S. at 279–84, 106 S.Ct. at 1849–52 (plurality); *see also Steelworkers v. Weber*, 443 U.S. 193, 208, 99 S.Ct. 2721, 2730, 61 L.Ed.2d 480 (1979) ("The [affirmative action] plan does not require the discharge of white workers and their replacement with new black hirees."). An employee on the job has an important stake in his position with his employer. His financial affairs and other obligations will be arranged around certain settled expectations that his paychecks will continue. The coercion and control that an employer may exercise over an employee by threat of termination is great. On the other hand, an applicant seeking employment has not arranged his affairs around any expectation of an income stream from the job he seeks. Instead of depriving him of his livelihood, a patronage system lowers his chances for receiving employment with one of many potential employers. If he is employed elsewhere, a rejected application will probably have little effect on his income.

Likewise, absent unusual circumstances, employment decisions not involving dismissals, such as failing to transfer or promote an employee, are significantly less coercive and disruptive than discharges. While a person denied a promotion or transfer will certainly be disappointed and may remain in a lower-paying position, he still retains his job and his ability to meet his financial obligations.

The Sixth Circuit implicitly recognized the distinction between patronage discharges and less burdensome patronage practices in *Avery v. Jennings*, 786 F.2d 233 (6th Cir.), *cert. denied*, 477 U.S. 905, 106 S.Ct. 3276, 91 L.Ed.2d 566 (1986), which upheld patronage hiring practices against First Amendment attack. The plaintiff in *Avery* unsuccessfully applied for positions in three different county departments controlled by Republicans. The department heads filled vacancies with friends and relatives and with friends and relatives of their political supporters. Of the 432 persons hired in the three departments over a seven-year period, only ten were Democrats.

The plaintiff did not receive a job because she was not connected to the patronage network. The three department heads testified at their depositions that they preferred hiring Republicans. One testified that he "would favor hiring qualified Republicans." Another stated that "all things being equal I prefer to have a Republican working for me because I assume that he will be more interested in taking part in helping me get re-elected." The third stated that "it just works better when people have the same philosophy." The district court granted summary judgment to the defendants on, among other grounds, the ground that *Branti* and *Elrod* did not extend to politically motivated hirings.

The Sixth Circuit affirmed. The court found that the First Amendment did not forbid a patronage system that relies on family, friends, and political allies for recommendations. While the court stated that a public employer could not bar a person from employment "solely" because of his political affiliation, the employer could rely on political factors in making decisions. The Sixth Circuit reasoned that the challenged patronage system was markedly different from public employer actions that the Supreme Court had declared unconstitutional. The challenged patronage system had many legitimate purposes such as finding good employees, extending political and personal friendships, and enhancing the official's performance and political appeal. Moreover, the court noted that any rule forbidding an employer from considering political affiliation in hiring would require invalidating hiring practices in public offices nationwide.

When balanced against the more limited burdens imposed by patronage practices other than dismissing or constructively discharging an employee, other interests strongly weigh against broadly expanding the rule enunciated in *Branti* and *Elrod*. In a representative government, the courts must afford the political process and political institutions great deference. Extending *Branti* and *Elrod* to virtually all employment decisions would raise profound

questions concerning democratic institutions that this court has previously found beyond our competence to answer. *See LaFalce*, 712 F.2d at 294.

Moreover, using political considerations in employment decisions is as old as this country. Although the age of a particular practice does not immunize it from constitutional challenge, *see, e.g., Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), "[i]f a thing has been practiced for two hundred years by common consent, it will need a strong case for the Fourteenth Amendment to affect it...." *Jackman v. Rosenbaum Co.*, 260 U.S. 22, 31, 43 S.Ct. 9, 9–10, 67 L.Ed. 107 (1922) (Holmes, J.). Thus, it is not irrelevant to our inquiry that George Washington and Thomas Jefferson were no strangers to either patronage hiring or the First Amendment. *See Elrod*, 427 U.S. at 377–78, 96 S.Ct. at 2691–92 (Powell, J., dissenting). The more widespread use of patronage, beginning with Andrew Jackson and extending to modern times, has been credited with increasing the level of participation in American politics. *Id.* at 377–80, 96 S.Ct. at 2691–92. By increasing the level of participation in American politics, patronage has also been credited with adding balance and stability to government. *Id.; see also Branti*, 445 U.S. at 526–32, 100 S.Ct. at 1298–1301 (Powell, J., dissenting). As Justice Powell has stated in support of patronage practices:

> Broad-based political parties supply an essential coherence and flexibility to the American political scene. They serve as coalitions of different interests that combine to seek national goals. The decline of party strength inevitably will enhance the influence of special interest groups whose only concern all too often is how a political candidate votes on a single issue. The quality of political debate, and indeed the capacity of government to function in the national interest, suffer when candidates and officeholders are forced to be more responsive to the narrow concerns of unrepresentative special interest groups than to overarching issues of domestic and foreign policy.

*Branti*, 445 U.S. at 532, 100 S.Ct. at 1301 (Powell, J., dissenting).

Finally, we note that the practical considerations relied on by this court in *LaFalce* are even more compelling in this case. Recognizing the rights asserted by plaintiffs in this case would potentially subject public officials to lawsuits every time they make an employment decision. We doubt that there is a single disappointed employee who could not point to political disagreement, or simply lack of agreement between himself and a hiring official or the person who received the desired position. Political issues and beliefs do not come in neat packages wrapped "Democratic" and "Republican." A wide variety of issues, interests, factions, parties, and personalities shape political debate. Moreover, it is questionable whether "politics" could be meaningfully separated from other considerations such as friendships, compatibility, and the enthusiasm to pursue the stated job goals. The Supreme Court has shown great reluctance to have the federal courts preside as "Platonic Guardians" over state employment systems. *See Connick*, 461 U.S. at 143, 103 S.Ct. at 1688 ("[G]overnment offices could not function if every employment decision became a constitutional matter."); *Bishop v. Wood*, 426 U.S. 341, 349, 96 S.Ct. 2074, 2080, 48 L.Ed.2d 684 (1976) ("[F]ederal court is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies.") By asking that we review virtually every significant employment decision for absolute political neutrality, plaintiffs essentially ask that we constitutionalize civil service and then preside over the system. This would be an unprecedented intrusion into the political affairs of the states as well as the executive and legislative branches of the federal government. In the absence of a clear indication from the Supreme Court, we will not take such a large step.

In sum, we believe *Delong*'s analysis provides the appropriate inquiry in patronage cases involving practices other than the actual or threatened dismissal from employment. In the political world in which democratic institutions exist, courts

should not interfere unless compelling reasons exist for doing so. Banning political considerations from all public service employment decisions, even if practical, would diminish the political will of the voters, insert courts into disputes between political factions, and stifle the ability of elected officials to govern. These public policy questions, rife with serious concerns over federalism and—in the case of federal employment—separation of powers, are best left in the political arena.

Having determined the appropriate analysis to apply to plaintiffs' claims, we must next determine whether, under that analysis, the district court properly dismissed plaintiffs' claims. Under Fed.R. Civ.P. 12(b)(6) a complaint may not be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claims that would entitle him to relief. *See Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957). In making this determination, a court must resolve all reasonable inferences in the plaintiff's favor. *See Hanrahan v. Lane,* 747 F.2d 1137, 1139 (7th Cir.1984). In light of the appropriate analysis and the stringent standards for Rule 12(b)(6) dismissals, we reverse the district court's decision to dismiss Standefer's, O'Brien's, Rutan's, and Taylor's claims, and affirm the decision to dismiss Moore's claim.

■ Moore alleges that he applied for jobs that were awarded to less qualified but politically favored persons. The district court correctly dismissed this claim.

As we explained above, rejecting an employment application does not impose a hardship upon an employee comparable to the loss of job. *See Wygant v. Jackson Board of Education,* 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1984) (plurality opinion); *see also Avery v. Jennings,* 786 F.2d 233 (6th Cir.1986).[4] Failing to obtain a particular position disappoints, but no more so than the plaintiff's failing to obtain employment in *Avery,* 786 F.2d at 236–37, the contractor's failing to obtain a contract in *LaFalce,* 712 F.2d at 294, or the independent contractors' losing their working relationships with the state in *Horn,* 796 F.2d at 674–75, and *Sweeney,* 669 F.2d at 545–46. Any burden imposed on an employment applicant does not outweigh the significant intrusion into state government required to remedy such a claim. While the wisdom of patronage hiring practices is certainly open to debate, the validity of such practices is something more appropriately addressed to the legislature rather than the courts.

■ The claims of Rutan and Taylor are more problematic than the claims of an employment applicant. Rutan alleges that she has been denied promotions that went to less qualified but politically favored persons. Taylor alleges that he has been denied a promotion that went to a less qualified but politically favored person. He also alleges that he was denied a transfer because he did not have the support of the Republican Party Chairmen in Fulton and Schuyler Counties. Although a close ques-

---

4. In *Avery v. Jennings,* 786 F.2d 233 (6th Cir. 1986), the Sixth Circuit indicated in dictum that hiring decisions based "solely" on party affiliation would violate the First Amendment. When faced with that dictum, a two-member majority of another Sixth Circuit panel "reluctantly" reversed a district court's decision to dismiss a complaint in which a plaintiff alleged that a hiring decision was based "solely" on political considerations. *Messer v. Curci,* No. 85–5626, slip op. (6th Cir. Dec. 2, 1986) [available on WESTLAW, CTA database] (available on LEXIS), *vacated and rehearing en banc granted,* No. 85–5626 (6th Cir. Jan. 21, 1987) (order) (available on LEXIS). The majority believed the complaint failed to state a claim but decided for prudential reasons to follow *Avery's* dictum. The third member of the panel dissented on the

ground that the panel was not bound by the dictum and that the complaint failed to state a claim.

We agree with the panel in *Messer v. Curci* that it should not matter whether the complaint alleges that patronage was the "sole reason" or a "motivating reason." We do not believe the fact that Democrats filled 10 out of 432 available slots was dispositive on the issue of whether political factors may be taken into account by a public employer. *Avery* added this dictum to reconcile its holding with the Supreme Court's holdings in *Keyishian* and *Wieman* invalidating state laws banning Communists and other "subversives" from employment. These cases, however, are not controlling in the patronage area. Under the *Branti* and *Elrod* balancing test, different factors are involved in patronage cases.

tion, we believe the district court erred in dismissing these claims.

If we were reviewing this case after trial and the facts pleaded in the complaint constituted the only evidence in the record, the district court's judgment would be affirmed. As discussed above, merely failing to transfer or promote an employee is significantly less coercive or disruptive than discharging an employee. However, dismissing a complaint under Fed.R.Civ.P. 12(b)(6) is proper only if it appears beyond doubt that a plaintiff can prove no facts to support his claim. While it may be highly unlikely that a person who is merely denied a transfer or promotion can prove that the decision was the substantial equivalent of a dismissal, we cannot make this determination as a matter of law based on the minimal facts contained in the complaint. We are particularly reluctant to scrutinize Rutan's and Taylor's pleadings under freshly articulated standards. Whether a particular employment action is equivalent to a dismissal rests upon each case's facts and circumstances. *Cf. Clark v. Marsh*, 665 F.2d 1168 (D.C.Cir.1981) (upholding finding of constructive discharge when aggravating circumstances led an employee to retire after being denied a promotion). If Rutan and Taylor can assert that some special circumstances present in their cases would have led a reasonable person to quit, they should be permitted to pursue any such claim.

We also note that both Rutan and Taylor appear to have remained in their positions after the challenged employment decision. This is certainly relevant in determining the severity of the impact of the challenged patronage decision but does not as a matter of law prevent Rutan and Taylor from proceeding with their claims. We agree with the position implicit in *Delong* that a First Amendment violation occurs when the burden placed upon a particular employee is substantially equivalent to a discharge. An employee could stay on the job and withstand very difficult circumstances that might cause others similarly situated to quit. Financial circumstances may not allow the person the luxury of resigning before finding other employment. That circumstances prevent an employee from resigning does not decrease the burden the employer has, in fact, placed upon him.

We emphasize that the issue is not whether partisan reasons entered into a particular employment decision. Rather, the issue is whether a partisan decision imposed such a burden upon a particular employee that it would have led a reasonable employee to quit. There are a wide variety of employment decisions made every day that result in disappointment to employees. For every person promoted there are several others who wish they had been. Federal court is not intended to be the final arbiter for every real or imagined slight claimed by disappointed employees. It is only when a particular patronage practice could *reasonably* be thought to be the substantial equivalent of a dismissal that such a practice violates the First Amendment.

■ Standefer's and O'Brien's claims are more straightforward. Standefer alleges that he was laid off from a "temporary position" at the State Garage in Springfield along with five other employees. The five other employees, who had the support of the Republican Party, were offered other state jobs. Standefer was not. Resolving all reasonable inferences from these facts in Standefer's favor, these allegations may support a claim that a public employer conditioned Standefer's continued employment with the State upon Standefer's political affiliation. This is the type of conduct found constitutionally impermissible in *Branti* and *Elrod*.

This is not to say that a laid-off employee is automatically entitled to be considered for other positions with the State, or even his old position, without patronage considerations being taken into account. Failing to rehire after layoff does not in and of itself violate the rule enunciated in *Branti* and *Elrod*. Many laid-off employees will stand essentially in the position of new job applicants when they seek a position. But not all employees will be in that position. If a formal or informal system exists for placing employees into other positions, that

system must not include partisan political considerations that cause an employee to lose his employment with the state.

On remand, the court must consider all the facts and circumstances of Standefer's case with the ultimate inquiry being whether a politically motivated failure to place Standefer in another position was the substantial equivalent of a termination from employment. In making this determination, we believe that several facts deserve special consideration. The district court should consider: whether the employment relationship was considered to be "temporary" rather than "permanent"; whether the "layoff" was merely the end of a temporary position or whether it was a true layoff; whether employees had reasonable expectations of placement into other positions upon layoff; whether the previous employment with the State was simply a minor factor considered with many others in an *ad hoc* process or whether it was essentially determinative in being placed in the new position; and, whether there was a substantial time lapse between the layoff and placement of other employees or whether the placement into other positions was made contemporaneously with the layoff. Although we have listed these facts, we do not purport to delineate every possible factor or the weight to be given to each factor. Rather, as stated above, the court must look at all the facts and circumstances with an eye towards ultimately determining whether failing to place Standefer in a position after layoff was substantially equivalent to terminating his employment.

O'Brien alleges that he was laid off from a position at the Lincoln Development Center. He does not allege that he had any specific right to recall. But he does allege that, under the Center's policies, he could be recalled within two years, and if recalled, there would be no break in his seniority and other benefits. "Several months" after being laid off he received a position with the Department of Corrections in which he had no accrued seniority or benefits. In February of 1985 (apparently after he was working at the Department of Corrections), he was told by an administrator at the Center that he would

be rehired if the Center received an exception to the "hiring freeze." The Governor's Office denied the request for an exception.

■ Laying off an employee suspends the employee's working relationship with an employer but does not usually terminate the relationship. Absent indications that the layoff of an employee is "permanent," a layoff will typically involve some formal or informal expectation of being placed back in the position if, within some specified or reasonable time period, the job becomes open once again. A person who has ordered his life around a particular job, built up experience and seniority in the position, and has a reasonable expectation of being recalled to that position stands in far different position than an employment applicant. After a layoff, a recall to the same job conditioned upon an employee's political affiliation is the type of inherently coercive conduct that *Branti* and *Elrod* found to violate the First Amendment.

There are some factors in O'Brien's case that take it beyond a straight failure to recall from layoff case. First, O'Brien does not allege that there was a general recall that he was left out of because he was not a Republican supporter. In fact, he does not even allege that his position was filled by anyone within the two-year recall period. Absent these facts, he may have a difficult time proving his claims. Nonetheless, the allegation in the complaint that, absent political considerations, he would have been granted an "exception" to the "hiring freeze," and thus been reinstated into his job, is sufficient to state a claim for relief.

Second, O'Brien apparently held a position with the Corrections Department at the time he was denied an exception to the "hiring freeze." Thus, the alleged patronage system did not deny him employment altogether. Nonetheless, as discussed earlier, the fact that a person is on the state payroll does not automatically render the claim insufficient as a matter of law.

In sum, we affirm the district court's decision dismissing Moore's claim. We re-

verse the district court's decision dismissing the employment claims of the other plaintiffs and remand for further proceedings consistent with this opinion.[5]

### D. *Voter Challenges to Patronage Practices—Standing.*

In addition to challenging the alleged patronage system as employees, plaintiffs, as voters, also claim that the patronage system deprived them of "equal access and effectiveness of elections." Plaintiffs allege that the patronage system gives Governor Thompson and his supporters a significant advantage over their opposition in elections. The district court never reached the merits of this claim on the ground that the plaintiffs lacked standing. We agree.

In *Shakman v. Dunne,* 829 F.2d 1387 (7th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1026, 98 L.Ed.2d 991 (1988), this circuit analyzed the standing requirement as applied to claims by candidates and voters challenging patronage hiring practices in Cook County, Illinois. In *Shakman,* the candidates and voters claimed that patronage hiring had the "purpose and effect" of giving incumbent Democratic officials a significant advantage in communicating with the electorate. The court rejected plaintiffs' claims, holding that the candidates and voters had no standing to challenge patronage hiring. In finding that the plaintiffs lacked standing, the court reasoned that the chain of causation between the challenged governmental activity and the alleged injury was too tenuous:

> [W]e find the line of causation between the appellants' activity and the appellees' asserted injury to be particularly attenuated.... [T]he line of causation depends upon countless individual decisions. Moreover, those countless individual decisions must depend upon ... countless individual political assessments that

those who are in power will stay in power. It is not the hiring policy itself which creates any advantage for the incumbents. Any other candidate is entirely free to assert that, if elected, he will follow the same policy. Any advantage obtained by the incumbent is obtained only if the potential workers make an independent evaluation that the incumbent, and not the opposition, will win. The plaintiffs will be at a disadvantage if—and only if—a significant number of individuals seeking political job opportunities determines the 'ins' will remain the 'ins.'

*Id.* at 1397. The court also noted that so many factors, many not even capable of articulation, determine a person's political activity that the plaintiffs could not say that their alleged injuries were "fairly traceable" to the defendants. *Id.; see also Winpisinger v. Watson,* 628 F.2d 133 (D.C. Cir.), *cert. denied,* 446 U.S. 929, 100 S.Ct. 1867, 64 L.Ed.2d 282 (1980) (supporters of President Carter's primary opponent did not have standing to challenge Carter Administration award of 275,000 census jobs allegedly conferred on a political patronage basis).

Here, plaintiffs' standing argument is no different from that rejected in *Shakman.* In fact, plaintiffs made clear that their claims are virtually the same claims the district court held sufficient to confer standing in *Shakman* (which was reversed after oral argument in this case). *See Shakman v. Democratic Organization of Cook County,* 481 F.Supp. 1315 (N.D.Ill. 1979), *rev'd in relevant part,* 829 F.2d 1387 (7th Cir.1987). Like the plaintiffs in *Shakman,* plaintiffs contend that patronage has created an advantage in favor of the incumbents.

■ This does not confer standing on voters. The causal link between any "loss"

**5.** On remand the district court should also "as soon as practicable" consider whether the individual employees may properly bring their claims as class actions. Fed.R.Civ.P. 23(c). In view of the individualized determinations necessary for the resolution of the claims, the district court should carefully scrutinize the claims before deciding to certify any class. *See generally*

*General Telephone Co. v. Falcon,* 457 U.S. 147, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982).

We also note that defendants have argued on appeal that they are entitled to qualified immunity from damages. Such a request is more appropriately addressed to the district court on remand.

in their votes' impact and the challenged actions is too tenuous. Indeed, plaintiffs' statewide challenge presents a more tenuous causal relationship than the challenge mounted in *Shakman* by voters *and* candidates to patronage hiring in a single county. Because the injury asserted in the complaint is not fairly traceable to the challenged action, the district court properly dismissed plaintiffs' claims as voters for lack of standing.

Each side shall bear its own costs.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

RIPPLE, Circuit Judge, concurring in part and dissenting in part.

I join that part of the court's judgment dismissing the plaintiffs' claims, brought as voters, which assert that the patronage system deprives them of "equal access and effectiveness of elections." R. 1 at ¶ 24(d). As the majority notes, that aspect of this case is governed by our holding in *Shakman v. Dunne*, 829 F.2d 1387 (7th Cir. 1987), *cert. denied,* — U.S. —, 108 S.Ct. 1026, 98 L.Ed.2d 991 (1988).

I also concur in that portion of the judgment that remands the claims of Cynthia Rutan, Franklin Taylor, Ricky Standefer, and Dan O'Brien to the district court for further proceedings. However, I respectfully part company with my brothers on the appropriate test that ought to be applied upon remand. Today, the majority adopts the wooden analysis of *Delong v. United States*, 621 F.2d 618 (4th Cir.1980), a test formulated immediately after the Supreme Court's decision in *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), and one that has not gained respect in the other circuits that have had the time to take a more measured view of the holding of *Branti*. As the majority points out, the Third Circuit has explicitly disavowed the *Delong* approach in *Bennis v. Gable*, 823 F.2d 723 (3d Cir. 1987). Moreover, this circuit and the Eleventh Circuit have also taken far more reasoned approaches to the analysis of *Branti* and *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). *See Hermes v. Hein*, 742 F.2d 350, 353 (7th Cir.1984); *Waters v. Chaffin*, 684 F.2d 833, 837 n. 9 (11th Cir.1982).[1]

Although the *Delong* test attempts to apply the *Elrod* criteria to cases not involving discharge, its approach is an illusory one. It places an unrealistic burden of proof on the plaintiff and creates an impossible judicial task. To succeed, the plaintiff must establish that, although a reasonable person would resign under such pressure to his first amendment rights, he has decided to "hang on." It is not surprising that the *Delong* test would produce such an unrealistic burden of proof; it is premised on a fundamental misapprehension of the analysis required by established first amendment jurisprudence. As the Third Circuit noted in *Bennis*, "the constitutional violation is not in the harshness of the sanction applied, but in the imposition of any disciplinary action for the exercise of permissible free speech." 823 F.2d at 731 (footnote omitted). The government must establish that the particular restriction on first amendment freedoms which it desires to impose can be justified by the important needs of the government. *See Connick v. Myers*, 461 U.S. 138, 142, 103 S.Ct. 1684, 1687, 75 L.Ed.2d 708 (1983); *Pickering v. Board of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968); *Keyishian v. Board of Regents*, 385 U.S. 589, 605-06, 87 S.Ct. 675, 684-85, 17 L.Ed.2d 629 (1967); *see also McGill v. Board of Educ. of Pekin Elementary School Dist. No. 108*, 602 F.2d 774, 780 (7th Cir.1979). If the government cannot justify the need to restrict the first amendment freedoms of an individual for an important governmental reason, it may not impose any punishment on that individual for the exercise of his first amendment rights. By contrast, the majority's approach is simply a manifestation of its willingness to tolerate "mi-

---

1. The *Delong* test has met a similar fate at the hands of a panel of the First Circuit. *See Agosto De Feliciano v. Aponte Roque*, No. 86-1300 (1st Cir. Aug. 14, 1987) (1987 U.S. App. LEXIS 10833). That opinion has now been vacated and the case has been reheard en banc. The matter is presently *sub judice*.

nor punishment" for the legitimate exercise of first amendment rights. The majority tells the public employee that, even if the government has no legitimate need to curtail his first amendment rights, it may subject him to discrimination and any other form of abuse as long as it does not go too far and create a situation where a reasonable employee would say "enough" and resign. Such a statement of the law is simply not correct. *See Connick,* 461 U.S. at 142, 103 S.Ct. at 1687; *Branti,* 445 U.S. at 515 n. 10, 100 S.Ct. at 1293 n. 10. As this court noted in *Bart v. Telford,* 677 F.2d 622, 625 (7th Cir.1982), "[t]he effect on freedom of speech may be small, but since there is no justification for harassing people for exercising their constitutional rights it need not be great in order to be actionable." [2]

The majority's holding today will subject countless dedicated government workers, for whom party affiliation is not an "appropriate requirement for the effective performance of the public office involved," *Branti,* 445 U.S. at 518, 100 S.Ct. at 1295, to harassment because they have chosen not to contribute to or work for a particular candidate or cause. For instance, the clerical worker who has strong views on the abortion issue and refuses to support a candidate of opposing views may now be passed over for promotion, denied transfer to a more favorable location, or assigned the most undesirable tasks in the office. The worker who decides not to support a particular candidate because, in the worker's view, the candidate is not committed to racial equality can be treated in identical fashion. This growing acceptance of infringements on first amendment rights on the ground that the curtailment is minor is indeed a disturbing trend. "It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way...." *Boyd v. United States,* 116 U.S. 616, 635, 6 S.Ct. 524, 535, 29 L.Ed. 746 (1886).[3]

I must also respectfully dissent from the decision to affirm that portion of the district court's judgment that dismisses on the complaint the allegation of James Moore that his freedom of association was violated by the policy of the state to hire only those applicants who were determined to be politically acceptable. Patronage hiring admittedly presents a different situation from politically based firings and adverse personnel actions against state employees. However, as the majority appears to concede, the use of political criteria in the hiring process does implicate first amendment rights. Therefore, it must be determined whether the state's purpose in utilizing such politically based criteria serves a sufficiently important governmental inter-

---

2. The analysis appropriate for infringements on freedom of speech also applies to associational rights. As the Supreme Court noted in *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972):

> For at least a quarter-century, this Court has made clear that even though a person has no "right" to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech. For if the government could deny a benefit to a person *because of his constitutionally protected speech or associations,* his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to "produce a result which [it] could not command directly." *Speiser v. Randall,* 357 U.S. 513, 526 [78 S.Ct. 1332, 1342, 2 L.Ed.2d 460]. Such inter-

ference with constitutional rights is impermissible.

*Id.* at 597, 92 S.Ct. at 2697 (emphasis supplied).

Even if we assume, arguendo, that more of a burden is permissible when we are dealing with the implied right of freedom of association rather than the explicit right of free speech, the threatened loss in this case is clearly sufficiently burdensome to amount to a substantial burden on the plaintiffs' first amendment rights. *See Bart v. Telford,* 677 F.2d 622, 625 (7th Cir.1982).

3. The majority also appears to invoke a rule of necessity to justify its course. It fears that the adoption of any rule other than the *Delong* test will transform the federal courts into a "supercivil service bureau" for all state and federal employees. Even if we assume that such concerns are relevant, we would be left with the fundamental reality that the protection of first amendment rights is indeed the proper work of the federal court. Our litigation process contains adequate steps to eliminate nonmeritorious cases.

est to permit the curtailment of first amendment freedoms.

The fundamental flaw in the majority's approach is that it pays only lip service to the basic standard governing dismissals under Rule 12(b)(6):

> In appraising the sufficiency of the complaint we follow, of course, the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.

*Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). In complex cases involving both fundamental rights and important questions of public policy, such peremptory treatment is rarely appropriate. *See Hobson v. Wilson,* 737 F.2d 1, 31 n. 88 (D.C.Cir.1984) (quoting 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1230 (1969 & Supp.1984)), *cert. denied,* 470 U.S. 1084, 105 S.Ct. 1843, 85 L.Ed.2d 142 (1985). In neither *Branti* nor *Elrod* did the Supreme Court attempt to deal with patronage practices on such a meager record. Nor did the Sixth Circuit attempt such a feat in *Avery v. Jennings,* 786 F.2d 233 (6th Cir.), *cert. denied,* 477 U.S. 905, 106 S.Ct. 3276, 91 L.Ed.2d 566 (1986). Significantly, *Avery* was decided on a motion for summary judgment rather than a 12(b)(6) motion to dismiss. Thus, the court had the benefit of greater detail as to how the patronage system actually operated:

> The political affiliation of a job applicant is taken into account in the hiring process in a round-about sort of way. As jobs become available, the official for the most part fills the vacancies informally on an *ad hoc* basis with friends, relatives, or acquaintances, or with the friends or relatives of political allies. Since plaintiff was unconnected with this network, her application was not considered.

*Id.* at 234.[4]

As the majority points out, this case involves individual plaintiffs, not a class action. It also involves one particular political patronage system. However, we know very little, on the basis of the complaint alone, about the impact of this political patronage system on the first amendment rights of job applicants. We also know very little about the justification for this political patronage system. In my view, this case should be remanded to the district court. There, after adequate development of the record, the district court will be able to accomplish several tasks that are essential to a full and fair analysis of this case: 1) a thorough examination of the operation of *this* patronage system and the effect of that operation on the plaintiff; and 2) a thorough examination of the justifications for this particular system proffered by the defendants.

On the basis of the complaint, we do not even know the specific requirements imposed by this patronage system on the job applicant. We cannot determine, simply on the basis of the complaint, the degree to which the alleged patronage practices—or any combination of them—actually infringe on the first amendment rights of the plaintiff. It is not at all clear what a prospective employee must do to win the endorsement of the party representatives. There

---

4. *LaFalce v. Houston,* 712 F.2d 292 (7th Cir. 1983), *cert. denied,* 464 U.S. 1044, 104 S.Ct. 712, 79 L.Ed.2d 175 (1984), was decided on the pleadings. *LaFalce* involved the claim of an unsuccessful bidder who challenged the city's use of political considerations in the awarding of public contracts. However, the court's task in *LaFalce* under the first amendment encompassed a far more simple and focused inquiry of competing interests than is true in this case. In *LaFalce,* the actual operation of the bidding system and its effects on individual contractors were fairly straightforward and well defined. The court itself acknowledged that the situation of contractors, presented in that case, and that of public employees, as is presented here, are not analogous because the relative strength of the competing interest in the two classes of plaintiffs differs significantly—so much so that the first amendment claim of the public contractor could be foreclosed on a motion to dismiss. Perhaps the court was justified in the public contracting context in treating the plaintiff's claim summarily. However, we should not extend such a summary treatment of first amendment rights to a case such as this one that squarely implicates the contours of Supreme Court precedent.

is a significant, and perhaps crucial, difference between a prospective government employee's having to be a registered Republican and having to do political work that involves endorsing publicly particular political positions that the applicant does not espouse or being required to pay the party in order to obtain favorable action on a job application.

Not only do we know very little about the actual operation of this particular patronage system and the resultant degree of infringement on the applicant's first amendment rights, we also know very little about the countervailing need of the state government for such a patronage system. Although the majority discusses at length the benefits of a strong patronage system, its evaluation of those benefits is not based on any knowledge of the *actual* operation of *this* system. Rather, its evaluation appears to be based on two sources totally external to this litigation: 1) the majority's own predilections; and 2) the majority's agreement with the conclusions of the dissenting justices of the Supreme Court of the United States in *Branti* and *Elrod.* Neither is an appropriate basis for decision by judges of an intermediate appellate court. It is perfectly proper and, indeed, unavoidable, for judges to *evaluate* the facts of a case in terms of their own experience. However, to perform that task, one must first know the facts of the case; at this stage of the proceedings, we simply do not have that information. To evaluate, on the basis of the pleadings alone, the need for such an extensive patronage system is pure *ipse dixit.* Similarly, the majority cannot dismiss this complaint on the basis of the dissenting opinions in *Elrod* and *Branti.* I respectfully submit that, as an intermediate appellate court, we ought not rely on a point of view that higher authority has rejected unless we can demonstrate that the *record* before us justifies such a deviation. Here, of course, we have no record other than the complaint. In short, adjudication of the issue of patronage hiring requires a far more focused inquiry than this court can possibly undertake at this stage of the proceedings.

In my view, the patronage hiring claim ought to be remanded to the district court for further development of the record. That court can then render a considered judgment as to whether the rights of this plaintiff have been violated. On review, the judges of this court will be able to evaluate the judgment on the basis of the record—not on the basis of their own suppositions or predilections.